IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANGELA L. ORTIZ,

        Plaintiff,

vs.                                                                                        No. CIV 08-674 WJ/RHS

MICHAEL J. ASTRUE,
**Commissioner of the**
**Social Security Administration,**

        Defendant.

**MAGISTRATE JUDGE'S FINDINGS**
**AND RECOMMENDED DISPOSITION**[1]

**I.**    **FINDINGS:**

    1.    On October 28, 2005, Plaintiff Angela L. Ortiz ("Ortiz") filed an application for

disability insurance benefits ("DIB").[2] [AR 53, 100.]  The Commissioner of Social Security issued

a final decision denying benefits, finding that Ortiz was not disabled and not entitled to DIB. [AR

33.] On April 9, 2009, Ortiz filed a Motion to Reverse or Remand Administrative Agency Decision.

[Doc. Nos. 23, 24.]  The Commissioner filed a response to Ortiz's Motion [Doc. 25], and Ortiz filed

---

[1]**Within ten (10) days after a party is served with a copy of these findings and**
**recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections**
**to such findings and recommendations.  A party must file any objections with the Clerk of**
**the U.S. District Court within the ten-day period allowed if that party wants to have**
**appellate review of the findings and recommendations.  If no objections are filed, no**
**appellate review will be allowed.**

[2]The Court did not locate the original application for DIB in the Administrative Record ("AR"), but the
filing date is noted on the denial of the initial application. [AR 53.] There is an earlier application for DIB in the
record, along with related disability pleadings. [AR 94.]

a reply [Doc. 28].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court  recommends that Ortiz's Motion be denied for the reasons stated below.

## General Background

2.      Ortiz alleges she was disabled and unable to work as of August 27, 2003,[3] due to spinal impairments, including a disc herniation at C4 and C5, insertion of a metal plate with disc fusion, a bulging disc at C5-C6, osteoarthritis ("OA") in the lumbar spine, deafness in the right ear and hearing loss in the left ear.  [AR 103-04.] Counsel for Ortiz characterizes her alleged disabling conditions as: "Degenerative Joint Disease of the L4-L5 facet joints, Degenerative Disc Disease of the cervical spine, Chronic pain, and Depression." [Doc. 24, p. 2.] Ortiz claims she could not work "because [she] was in a car accident and . . . had a neck injury and vertigo and [she] had surgery in April of 2004 on [her] neck." [AR 104.] Ortiz received short and long term disability in 2003 and 2004 from her previous employer.  [AR 104.]  Ortiz's benefit applications were denied at the initial and reconsideration levels. [AR 50, 52, 67, 71.]  On October 29, 2007, the ALJ conducted an administrative hearing in Albuquerque, New Mexico, at which Ortiz was present and represented by counsel. [AR 500.]  On February 13, 2008, the ALJ issued a decision finding Ortiz not disabled. [AR 33-43.]  Thereafter, Ortiz filed a timely request for review.  On April 22, 2008, the Appeals Council denied Ortiz's request for review and upheld the final decision of the ALJ.  In so doing, the Council considered a letter written by Ortiz's initial attorney.  [AR 3, 6.]

3.      In about June 2008, Ortiz retained new counsel, who submitted another letter to the Appeals Council, along with additional evidence, including, but not limited to, medical records, a

_____

[3]Ortiz initially claimed a disability onset date of October 19, 2005, but amended that date to August 27, 2003 at the ALJ hearing. [AR 33, 100.]

2

clinical psychologist's evaluation completed in July 2008, and a letter from Ortiz's husband. [AR 11-14, 23, 24, 28, 97.] Ortiz's new attorney asked to reopen the case and requested more time to file a civil action.  On August 14, 2008, the Appeals Council denied the request to reopen. [AR 9.] It does not appear that the additional materials submitted by Ortiz [AR 11-28] were reviewed by the Appeals Council, unless duplicate records were already part of the AR.  On July 21, 2008, Ortiz filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

4.      Ortiz was born on April 20, 1953 and was 49 years old at the time of the ALJ hearing. [AR 94, 100, 501.] She obtained a G.E.D. in 1981. [AR 108.]  Ortiz was an assembler with Honeywell from about 1992 to August 2003; part of her job involved soldering. [AR 503.]  She also worked for the City as a summer lunch aide and a teacher's aide from 1990 to 1992. [AR 110-111.]

5.      Ortiz's earning records indicate that in 1993 to 1996, she made from $11,432 to $18,550.  From 1997 to 2003, she earned over $20,000 a year.  In 2004, Ortiz had $10,850 of earnings, but those earnings were from long-term disability, as were some of the 2003 earnings. [AR 89-93, 503.] There are no earnings recorded after 2004.

6.      Ortiz has been married for thirty years.  Her husband is a full-time custodian with Albuquerque Public Schools.  She has a grown daughter and son who live on their own. [AR 12,[4] 103, 196.]

### Standards for Determining Disability

7.      In determining disability, the Commissioner applies a five-step sequential evaluation process.[5]  The burden rests upon the claimant to prove disability throughout the first four steps of

---

[4]Information about Ortiz's husband's work was not before the ALJ or Appeals Council.

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

this process, and if the claimant is successful in sustaining her burden at each step, the burden then

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines

that the claimant is or is not disabled, the evaluation ends.[6]

8. Briefly, the steps are: at step one, claimant must prove she is not currently engaged

in substantial gainful activity;[7] at step two, the claimant must prove her impairment is "severe" in

that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[8] at step

three, the Commissioner must conclude the claimant is disabled if she proves that these impairments

meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P,

App. 1 (1999);[9] and, at step four, the claimant bears the burden of proving she is incapable of

meeting the physical and mental demands of her past relevant work.[10]  If the claimant is successful

at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that

considering claimant's RFC,[11] age, education and past work experience, she is capable of performing

other work.[12]

9. At step five, the ALJ can find that the claimant met her burden of proof in two ways:

(1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids."

---

[6]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[7]20 C.F.R. § 404.1520(b) (1999).

[8]20 C.F.R. § 404.1520(c) (1999).

[9]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[10]20 C.F.R. § 404.1520(e) (1999).

[11]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[12]20 C.F.R. § 404.1520(f) (1999).

Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[13]

10.     In this case, the ALJ made the non-disability finding at step five by relying on the grids. [AR 43.]

**Standard of Review**

11.     On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

---

[13]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

12. It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

13. After "careful consideration of the entire record" [AR 35], the ALJ denied Ortiz's request for benefits. [AR 33-43.] The ALJ determined that Ortiz was not engaging in substantial gainful activity since the amended onset date of August 27, 2003. The ALJ also found that Ortiz had severe impairments of "neck pain status post cervical discectomy and fusion, lumbar degenerative facet disease at L4 through L6, occasional episodes of vertigo, and deafness in the right ear." [AR 35.] The ALJ further decided that Ortiz's "lumbar scoliosis, right finger condition, depression, anxiety, and history of alcohol abuse" were non-severe impairments. [AR 35-36.] The ALJ found that none of the impairments or combination of impairments met listing criteria. [AR 37.] "After careful consideration of the entire record," the ALJ concluded that Ortiz had the residual functional capacity to perform "a wide range of work with the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; the ability to sit, stand, and/or walk six hours; the ability to

stoop, crouch, crawl, and reach overhead only occasionally; and the need to avoid concentrated exposure to extreme cold and hazards . . . ." [AR 37.] In so finding, the ALJ decided that Ortiz's impairments could reasonably be expected to produce some of the alleged symptoms but that her statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible. [AR 38-39.]

14.     The ALJ decided that Ortiz was unable to perform any past relevant work because her employment as an assembler with Honeywell required lifting up to 50 pounds occasionally and 25 pounds frequently. [AR 42.]

15.     At step five, after considering Ortiz's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Ortiz could perform. [AR 42.] The ALJ stated that the non-disability finding was "directed" by the grids. [AR 43.] The ALJ did not rely on testimony of a vocational expert.

## Medical History/Background

16.     Ortiz's medical records span a part of 2002 through 2007.  Although she suffered injuries to her back from a motor vehicle accident ("MVA") in December 2002, no corresponding medical records document her emergency room visit on that date.  [AR 387, 449.]

### *2003*

17.     Ortiz saw multiple medical providers in 2003 and was examined frequently.  Her primary care physician, Dr. Hughes at Lovelace, saw Ortiz on January 20, 2003.  She was following up on the injury she sustained in the December 2002 MVA.  At that time, the diagnoses were cervical muscle strains and shoulder myalgias.  Although Ortiz was employed with Honeywell at the time, she had not worked since the MVA.  She was wearing a cervical collar and had previously

used muscle relaxants for pain.  She occasionally took Vicodin, a narcotic pain killer. [AR 385.] Ortiz was tentatively scheduled to return to work on January 27, 2003, without restrictions.

18.     On February 13, 2003, she had an MRI of her cervical spine that "strongly suggested" left lateral herniation at C5-C6 and degenerative change of a central disc bulge at C4-C5. [AR 395, 460.]  Ortiz saw Dr. Ortiz throughout 2003, on at least thirteen different occasions. [AR 367, 369, 371, 373, 377, 378, 380, 382, 383, 385, 429.] Her complaints were consistent: neck pain that started almost immediately after the MVA, pain and discomfort, particularly on the left side, fatigue, left lateral disc herniation, and a central disc bulge, secondary to the MVA. [*See, e.g.,* AR 382, 383, 377, 429.]

19.     Even though Ortiz's complaints continued, she returned to work on January 27, 2003. [AR 383-84.] Dr. Hughes recommended she return on four-hour shifts per day, but Ortiz returned to full-time work because she worried about losing her job.  She was not to do any heavy lifting that might impact her neck injury. [AR 383-84.]

20.     During 2003, Ortiz attended many physical therapy sessions at Lovelace.  She first complained of dizziness on March 6, 2003, during a physical therapy session.  She described the MVA as involving being rear-ended by a vehicle going 40 miles per hour, and that her backrest was broken in the accident. [AR 443.]

21.     Ortiz was also seen at the Lovelace Pain Clinic on several occasions in 2003. [AR 320, 434, 438.]  She complained of radicular pain to the upper left extremity that began in January 2003.  She suffered from an "aching, nagging, burning, and tingling pain" that was constant, although it did not interfere with her sleep. [AR 438.]  Ortiz also reported a history of lower back pain ("LBP").  During 2003, Ortiz was prescribed Vicodin, Flexeril and Ibuprofen to use as needed.

[AR 380.] She received an epidural injection to her spine that was only moderately successful in alleviating her chronic pain. [AR 382, 469.]

22.    On April 15, 2003, Ortiz reported to Dr. Hughes that Honeywell was going to require overtime work from employees.  Dr. Hughes agreed that Ortiz would not be able to work overtime because of the increase in pain and fatigue.  Dr. Hughes wrote that Ortiz had shown "significant fortitude and willingness to work throughout this fairly significant neck injury and symptom complex so I am going to recommend she not work overtime and limit her work to 40 [hours] or less per week." [AR 382.]

23.    On April 17, 2003, the pain specialist noted that Ortiz had a known disc herniation at C5-C6 and a degenerative disc bulge at C4-C5. [AR 434.]

24.    Physical therapy proceeded in 2003, but without significant improvement. [AR 429, 430, 432.]

25.    On July 16, 2003, Ortiz complained of a vertiginous episode in earlier July, when she felt like the room was spinning.  She also reported a history of right ear hearing loss that was documented six years ago. [AR 378.]

26.    In 2003, Ortiz was seen by audiologists and ENT specialists for vertigo and problems with hearing.  There was some concern that Ortiz might have cervical vertigo. [AR 326, 327.]

27.    In 2003, Ortiz was seen on at least three occasions by Dr. Erasmus, a neurosurgeon. [AR 324.] Dr. Erasmus noted that the ruptured disc at C5-C6 on the left side was probably the cause of her symptoms and that surgery was an option.  For the present, however, she continued with conservative measures, including epidurals, traction, and physical therapy. [AR 325, 352, 422, 490.]

28.    As of August 18, 2003, Ortiz was still working.  Dr. Hughes limited her work to a 40-hour work week, provided she not do any work above the shoulder level. [AR 376.] On August

27, 2003, Ortiz asked Dr. Hughes to give her medical leave from work until she completed her therapies. Dr. Hughes believed this was a reasonable request, given her symptom complex and need for daily therapy. Thus, he recommended medical leave from August 28, 2003 to October 3, 2003. [AR 375.]

29.     August 27, 2003 is the amended onset date of disability. Ortiz continued to extend her medical leave. She eventually was granted short term and long term disability. She never returned to work. [AR 369, 372.] Honeywell moved out-of-state at some point. [AR 33.]

30.     Ortiz continued to suffer from vertigo in 2003, sometimes described as "intractable vertigo." [AR 318.] Her vertigo was severe and made it difficult for her to get out of the house or function at work in September 2003. [AR 318.]

31.     Ortiz believed that surgery would help her vertigo but Dr. Erasmus disagreed. He believed that the only indication for surgery was her arm pain. He could not give her any guarantee that surgery could affect her vertigo. [AR 317.]

32.     On November 10, 2003, Ortiz had another MRI of the cervical spine. The left disc herniation at C5-C6 appeared to be slightly larger. [AR 308.] There was slight interval decrease in intervertebral disc space at C4-C5 and C5-C6. A stable central disc bulge was seen at C4-C5. [AR 309.]

33.     In December 29, 2003, after doing cervical traction for her neck pain, Ortiz reported that her LBP had flared up. Ortiz was to discontinue the traction and discuss possible disc surgery with Dr. Erasmus. [AR 367-68.]

### *2004*

34.      The administrative record contains a prior application for DIB in 2004 and related disability forms. [AR 55, 57, 58, 79, 81, 94, 161, 175, 185, 193, 294, 358.] The earlier claim for DIB was denied.

35.      In 2004, Ortiz continued to receive regular physical therapy.  She had a slight decrease in vertigo but it recurred. [AR 480.]

36.      Ortiz could take care of her personal needs in 2004 but she needed assistance when she suffered from vertigo.  She also could not lift heavy bags.  She was able to drive but used a neck collar; she did not drive when she felt dizzy.  Ortiz suffered from constant pain in her neck, left arm and shoulder. [AR 193-97.]

37.      On February 10, 2004, Dr. Alice Davidson performed a Residual Physical Functional Capacity Assessment.  She concluded Ortiz had exertional limitations then of lifting 20 pounds occasionally and 10 pounds frequently.  She could stand, sit or walk for six hours and there were no limitations in her abilities to push or pull.  The medical evidence was noted as to degenerative disc disease of the cervical spine and high frequency hearing loss. [AR 358.] The diagnosis was benign positional vertigo.  The medical evidence supported a light RFC with occasional postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling.  She was limited in reaching overhead.  She could not perform jobs that required excellent hearing.  Dr. Davidson concluded that Ortiz's allegations were credible based on the record. [AR 363.]

38.      In February 2004, the earlier application for DIB was denied.

39.      On April 9, 2004, Dr. Erasmus performed surgery on Ortiz's back to repair C5-C6.  Anterior cervical discectomy and fusion were performed at C5-C6. [AR 302, 313.] On April 20, 2004, Ortiz was able to stand from a seated position without difficulty.  Her gait was steady.  She

had no neurologic impairments and no paresthesias, tingling, or numbness.  She complained of left neck pain still.  She was trying to wean herself off Vicodin.  She had been ambulating around the house and the nurse discussed the need to increase activity and ambulation. [AR 302.]

40.     Ortiz filled out a daily activity report in 2004.  She was still recovering from the surgery.  She did not use a cane or wheelchair, but needed help cooking.  She was not performing household chores then and did not do the shopping. [AR 175-77.] She visited with people and went out occasionally when she could. [AR 178.] She felt a "little depressed."  She was fearful that the surgery would not help and that she would be paralyzed. [AR 180.]

41.     On May 13, 2004, Dr. Erasmus saw Ortiz.  She was doing "quite well."  Her arm pain was gone.  She was returning to her previous activities. [AR 300.] Dr. Erasmus estimated October 5, 2004 as a return to work date, with restrictions that Ortiz not lift over 10 pounds and not flex or extend her neck for prolonged periods.  He also restricted her to no prolonged sitting or standing (more than 15-30 minutes), and no activities involving bending, climbing, crawling, etc.  [AR 311.]

42.     On June 24, 2004, the SSA denied the request for reconsideration of Ortiz's earlier application for DIB.  A durational denial was proposed because it was expected that Ortiz would recover from her surgery and be able to return to work. [AR 75, 294.]

43.     On November 19, 2004, Ortiz was seen by Dr. Guttman with Lovelace.  She complained that she was depressed, had insomnia, and had decreased appetite and energy.  Dr. Guttman noted a history of alcoholism and depression in Ortiz's family.  She was tested for depression and the result was "marked" depression.  She was prescribed an anti-depressant, Paxil. [AR 243, 244.]

44.     Dr. Hughes saw Ortiz for the first time in 2004 on December 21, 2004.  She complained of fatigue, lack of restful sleep, diminished energy, and malaise.  The record is

noteworthy in that no complaints concerning Ortiz's neck or back are documented.  She was under

a lot of stress due to family matters.  She reported she was hesitant to begin the anti-depressant that

was prescribed.  Ortiz had been treated for anxiety in the past.  Dr. Hughes concluded her depression

was worth treating with medication.  Ortiz wanted to have some blood work done first. [AR 245.]

### *2005*

45.     In early 2005, Ortiz's back surgery was reported as successful.  Dr. Hughes noted that

Ortiz needed a "fairly carefully defined list of restrictions so that she might seek an appropriate job."

He intended to order a physical and occupational therapy functional capacity evaluation, but it is not

clear that an evaluation was done at this time. [AR 241, 273.]

46.     In April 2005, Ortiz suffered from severe right ear pain.  She was diagnosed with an

ear infection.  Her hearing acuity in the right ear was decreased. [AR 239.] A May 4, 2005 medical

record reports that Ortiz had right otitis media with secondary hearing loss over a month.  The acute

otitis had cleared up, but the hearing loss was sustained.  She was to get a second ENT opinion. [AR

237.]

47.     Ortiz saw Dr. Hughes in June 2005 and complained of LBP in the last week and

hearing loss.  Relative to the back pain, Ortiz had been lifting her 13-pound grandchild and believed

this aggravated her back.  On July 26, 2005, Ortiz was seen by an ENT specialist regarding her right-

sided hearing loss.  There was no change in the hearing loss, and the doctor recommended a hearing

amplification device. [AR 287.] On October 13, 2005, Dr. Horn again stated Ortiz would benefit

from the use of a hearing aide in the right ear. [AR 286.]  It does not appear that Ortiz ever obtained

a hearing aide.

48.     On August 25, 2005, Ortiz saw Dr. Hughes for complaints of right great toe pain and

right thumb pain after spraining it while pushing down a thumbtack.  An x-ray of her hand showed

no degenerative changes.  Dr. Hughes expected resolution of her thumb problem in the next month. [AR 234, 252.]

49.     On October 19, 2005, Dr. Hughes saw Ortiz for "chronic debilitating conditions," including right-sided hearing loss, left-sided hearing loss (partial), lumbar degenerative disc disease, and status post cervical fusion surgery.  Dr. Hughes reported that since the 2004 surgery, Ortiz had not returned to work.  Because of her symptomatic LBP, he wanted a physical therapy evaluation of her neck and back to define what she could safely do in the workplace.  Meanwhile, Ortiz developed sudden hearing loss, and the right ear had not recuperated.  After reviewing Ortiz's physical therapy evaluation, Dr. Hughes recommended that she not lift more than 15 pounds on a regular basis and not lift 12 pounds above her shoulder.  She also should not perform repetitive work of any type above the shoulder level.  Related to her lower back, a 15 pound restriction was more than reasonable.  Even so, Dr. Hughes believed she risked further damage if she had to do repetitive lifting.  "She may qualify for a sedentary job that does not require any lifting or work above shoulder level." [AR 232-33.]

50.     On October 28, 2005, Ortiz filed for DIB benefits, although the application is not in the administrative record.

51.     On November 20, 2005, Ortiz filled out an adult function report.  She drank coffee and watched a little television, ate breakfast, took a bath, washed dishes, read, walked, talked on the telephone, visited a friend, cooked a little dinner, washed dishes, watched television, listened to music, talked to her daughter, and went to bed.  She watched her granddaughter on occasion but did not lift her.  Ortiz could not lift at all.  She could not bend for long, and her pain level affected her sleep. [AR 149-150.] Ortiz could still take care of her personal needs but it took her longer to get dressed.  She used an oven and crock pot for cooking.  She needed help lifting in the kitchen.  She

14

never did yard work. She needed help washing floors or vacuuming. [AR 151.] She was able to walk and drive a car. She could shop and go to movies, concerns, museums, and out to dinner. [AR 153.] Sitting too long made her back hurt. She felt constant pain in her neck. Her attention span was two hours. She stated that her hand doctor, Dr. McGinty, had placed permanent restrictions on her right hand. [AR 156.] The Court found no medical records from Dr. McGinty in the administrative record.

### *2006*

52.     In January 2006, Dr. George Higgins performed a RFC. [AR 254.] Dr. Higgins noted that Ortiz was restricted to occasional lifting of 20 pounds and frequent lifting of 10 pounds. She could sit, stand, or walk for six hours. Her daily activities indicated she could do limited light housework indoors. She suffered from hearing loss, "partial of the right ear," after an ear infection. However, a non-severe loss of hearing was demonstrated by the testing results. Dr. Hughes' restrictions were reviewed which appeared consistent with the postural limitations Dr. Higgins observed. [AR 256.]

53.     In February 2006, Ortiz's 2005 application for DIB was denied. Her limitations were not sufficiently severe. [AR 52, 71.] In her appeal, Ortiz stated her activities were limited because of constant back and neck pain. She dropped things due to loss of grip in the right hand. [AR 122-25.]

54.     There is a handwritten function report, dated March 9, 2006. Her activities included walking three times a week for about thirty minutes. She had no problem with her personal care. Ortiz prepared meals for lunch and dinner and cooked once a day. She was able to do the laundry, vacuum, dust, wash dishes, but she had to stop and rest at times. She got out every day and could drive or go shopping. She visited friends once a week. However, she checked almost every box on

the disability form indicating she was affected by neck and back pain.  The pain increased when she did anything for a prolonged period. [AR 136-43.]

55.     Ortiz's underlying appeal was denied in April 2006.

56.     On July 5, 2006, Ortiz complained to Dr. Hughes of bilateral hand pain that was worse on the left side.   The hand problem was not related to any type of trauma although she did perform housework and some yard work. [AR 216.] An examination of her left hand was normal. An x-ray of the hand also was normal. [AR 224.] On July 11, 2006, Ortiz was advised to take Aleve for her hand pain. [AR 220.]

### *2007*

57.     Ortiz complained of sinus congestion in early 2007 and was concerned that it might impact her hearing again.  She was to see her otologist, Dr. Horn. [AR 212.]

58.     On May 3, 2007, Ortiz saw Dr. Guttman at Lovelace.  Although the record is not entirely legible, it appears that Ortiz was walking several times a week for 35 to 40 minutes.  This is the first record that documents Ortiz had an alcohol problem.  Ortiz was noted as being a binge drinker who had a drinking problem for 15 years.  She re-started drinking two years ago, or sometime in 2005.  However, the medical records from 2005 do not document any alcohol usage, nor did any of the earlier medical records document a history of alcoholism.  On this date, Ortiz complained of chest pain and felt very anxious because of family problems.  The alcoholism was making her anxious and she was attending Alcoholics Anonymous ("AA").  She was going to continue to attend AA.  The doctor gave her the name of a counselor but she did not want to see a therapist. [AR 200.]

59.     On July 3, 2007, Dr. Nancy Greces saw Ortiz.  Her lower back pain was worse.  She felt sharp pain that radiated into her left leg and shins.  She was agitated and not sleeping well.  She

took Ibuprofen.  The medical notes state that she is "trying to get disability." [AR 199.] Dr. Greces planned to get an x-ray of the lumbar spine.  She recommended a physical therapy evaluation and treatment.  The x-ray showed some sort of spasm without acute fracture, some degenerative joint disease, and normal disc spaces. [AR 208.]

60.      At the ALJ hearing on October 29, 2007, Ortiz was represented by counsel.  She testified that she drove periodically three times a week.  Ortiz still had a lot of pain and vertigo, although the vertigo was periodic and might not last long. [AR 506.] She felt a burning pain in her neck and suffered spasms in her neck and shoulders. [AR 507.] She was completely deaf in the right ear, and that affected her balance. [AR 509, 510.] Ortiz suffered constant pain in the lumbar back every day, and it hurt her to sit more than 20-30 minutes.  She also sustained an injury to the hand. She saw Dr. McGinty about it and was told she was at high risk to develop carpal tunnel syndrome. [AR 514.]

### *2008*

61.      On February 13, 2008, the ALJ issued an unfavorable opinion, finding that Ortiz was not disabled under the SSA. [AR 33-43.] The Appeals Council considered a letter from counsel, but denied the request for review.

62.      Ortiz then retained a new attorney, who wrote the Appeals Council stating he did not believe the ALJ had the complete medical records, in particular Dr. Greces' records from 2007. However, there was a 2007 medical record from Dr. Greces.  The new attorney also had Brenda Wolfe, Ph.D., Clinical Psychologist, perform an evaluation of Ortiz.  This evaluation pertained more to allegations of depression and anxiety, long-term alcohol abuse, a DUI in 2007, and childhood sexual abuse.  But, it does not appear that the ALJ or the Appeals Council considered this evaluation that was performed months after the ALJ issued her written decision. [AR 24,  33-43.]

17

63.     In addition, the new attorney submitted long term disability evaluations filled out in 2003 and 2004, related to insurance coverage at that time. [AR 15.] These evaluations pre-dated her April 2004 back surgery.  On one medical consultant's review, the health care provider noted he had not examined Ortiz. [AR 22.] These forms were not before the ALJ or the Appeals Council.

## II.     DISCUSSION

### A.     Alleged Legal Error

64.     Ortiz argues that the ALJ's RFC is unsupported by and inconsistent with the findings of Ortiz's treating physician; that direct application of the grids was legal error because Ortiz suffered from non-exertional impairments and pain; and that the credibility finding was contrary to substantial medical evidence.   [Doc. 24, p. 1.]

### B.     RFC Findings

65.     A person's RFC is what an individual can still do despite her limitations, and it constitutes "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, . . . may cause . . . limitations or restrictions that may affect his or her capacity to do work-related activities." S.S.R. 96-8p, 1996 WL 374184 at *2 (July 2, 1996).  The RFC is not the least an individual can do despite her limitations or restrictions, but the most.  20 C.F.R. § 404.1545 (2006).

66.     The ALJ is entrusted with the determination of the claimant's RFC, and such determination must be based on all of the evidence in the record.  20 C.F.R. § 404.1546; Corber v. Massanari, 20 F. App'x 816, 822, 2001 WL 1203004 at *5 (10th Cir. Oct. 11, 2001).  The ALJ must make specific findings as to RFC, Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996), and these findings must be supported by substantial evidence.  Adkins v. Barnhart, 80 F. App'x 44, 48, 2003 WL 22413920 (10th Cir. Oct. 23 2003) (internal citations omitted).

18

67. To determine the RFC, the ALJ assesses the claimant's ability to perform the physical demands of work activity and the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. S.S.R. 96-8p, 1996 WL 374184 at *7. The ALJ considers the relevant evidence in the record, medical history, medical signs, laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, effects of symptoms, and evidence from attempts to work. Id. at *5.

68. At step five, after a claimant establishes she cannot return to her past relevant work, the burden shifts to the Commissioner to show that the claimant retains the RFC to do other work that exists in the national economy. Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).

69. The ALJ determined at step four of this case that Ortiz had the RFC to perform a wide range of light work with the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; the ability to sit, stand, and/or walk six hours in an eight-hour workday; the ability to stoop, crouch, crawl, and reach overhead only occasionally; and the need to avoid concentrated exposure to extreme cold and hazards. [AR 37.] The ALJ further noted the definition of light work as involving lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. [AR 37-38.]

70. Ortiz argues that this RFC finding directly conflicts with Dr. Hughes' opinion, who provided recommendations on October 19, 2005, that Ortiz perform no lifting more than 15 pounds on a regular basis and that she not lift more than 12 pounds above shoulder level. Ortiz further cites Dr. Hughes 2005 recommendations that she not do repetitive work of any type above the shoulder level. While the 12-pound limit is reasonable, it would not be so if she were required to lift that

amount in a repetitive fashion.  Related to Ortiz's lower back, Dr. Hughes noted that "certainly a 15-pound lifting restriction is more than reasonable there, . . . [unless] she has to do any repetitive lifting."  Dr. Hughes stated that Ortiz "may qualify for a sedentary job that does not require any lifting or work above shoulder level . . . ." [AR 232-33.]

71.     Ortiz contends that Dr. Hughes' restrictions do not match the ALJ's RFC findings for light work, and that the ALJ failed to set forth any rationale for not relying on Dr. Hughes' limitations.  Moreover, as a treating source, Dr. Hughes' opinions were entitled to controlling weight, while reliance upon a non-examining medical consultant's opinions is not substantial evidence sufficient to trump a treating physician's opinion.

72.     The Court concludes that substantial evidence supports the ALJ's RFC findings and that she committed no error in reaching the RFC.  The Court disagrees that Dr. Hughes' 2005 restrictions are contradicted by the non-examining physician's 2006 restrictions.  Dr. Hughes opined that Ortiz should not lift more than 12 pounds above the shoulder.  This is not inconsistent with Dr. Higgins' evaluation that she be restricted to occasional lifting of 20 pounds and frequent lifting of 10 pounds.  A recommendation that Ortiz be limited to lifting no more than 15 pounds on a regular basis does not translate into a limitation that she cannot occasionally lift 20 pounds.  Moreover, Dr. Higgins expressly discussed Dr. Hughes' 2005 restrictions and found them to be "in line" with Dr. Higgins' marked restrictions. [AR 255-56.]

73.     The ALJ expressly discussed the 2005 limitations suggested by Dr. Hughes, implying that they were supportive of her RFC findings.  [AR 40,  41-42.] At no point in the very careful and detailed opinion did the ALJ state she was disregarding or discounting Dr. Hughes' opinion.  Indeed, there was no inference that the ALJ disagreed with Dr. Hughes' recommendations.  In addition, the ALJ observed that in June 2005, Dr. Hughes reported Ortiz's straight leg raising tests were negative

and that she did not have any neuralgic symptoms into either leg.  In November 2005, Dr. Hughes noted that he would recommend an x-ray to check the status of Ortiz's fusion if she did not recover from symptoms related to a recent fall. [AR 41.] Apparently, there was no need for the x-ray, as no x-ray report at this time occurs in the administrative record.  The ALJ discussed these records of Dr. Hughes, along with others.  For example, she relied on a recent medical record from July 2007 showing that Ortiz had normal muscle tone and strength in her lower extremities, normal deep tendon reflexes and negative bilateral lower extremity straight leg raising tests. [AR 40, 42.]

74.    In addition, while the ALJ considered and credited the non-examining physician's limitations [AR 41], she also relied on Ortiz's testimony [AR 38], physical therapy records [AR 39], audiologist's and otologist's reports [AR 39, 40], the neurosurgeon's reports [AR 39, 40], physical examinations of Ortiz [AR 40], Ortiz's medical treatment (use of Ibuprofen on an as needed basis and Gabapentin/Neurontin) [AR 41], the use of no medications for muscle spasms and no assistive devices for ambulation [AR 41], her daily activities (including her ability to drive regularly, and perform household chores of laundry, vacuuming, dusting, cooking and dish washing, and some yard work) [AR 41], and her election not to obtain a hearing aid as recommended by health care providers [AR 41].

75.    Indeed, the ALJ devoted at least five pages to the rationale for her RFC and to the discussion of the medical records in her ten-page decision. [AR 37-42.] The Court concludes that substantial evidence supports the RFC finding and that the ALJ committed no error in her consideration of Dr. Hughes' recommendations.

C.    Direct Application of the Grids at Step Five

76.    The fact that a claimant has both exertional and nonexertional impairments does not always mean vocational testimony must be presented.  In other words, the mere presence of a

nonexertional impairment does not automatically preclude the use of grids. Instead, the nonexertional impairment must interfere with the ability to work. *See* Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989). "[A] nonexertional impairment can have a negligible effect on the range of jobs available." Talbot v. Heckler, 814 F.2d 1456, 1465 (10th Cir. 1987). An ALJ may conclusively rely on the grids if she determines that the claimant has no significant nonexertional impairment and the claimant can perform most of the jobs at a particular exertional level, so long as these findings are supported by substantial evidence. Thompson, 987 F.2d at 1488.

77. Ortiz argues that the ALJ's direct application of the grids was in error because she suffers from nonexertional impairments, including reaching limitations, hearing loss, chronic cervical and lumbar spinal pain, and pain generally. Because of the nonexertional limitations, Ortiz contends that the ALJ was required to obtain vocational expert testimony. *See* Ramirez v. Astrue, No. CIV 06-2068, 255 F. App'x 327 (10th Cir. Nov. 20, 2007) (where a claimant suffers from nonexertional and exertional impairments, the Commissioner must prove through expert vocational testimony that jobs exist in the national economy that the claimant can perform).

78. The Court agrees with the general rule that the grids are not to be applied directly to support a finding of non-disability in the presence of nonexertional limitations. However, there are exceptions to the rule, *i.e.,* where substantial evidence supports a finding that the nonexertional limitations have a negligible effect on the availability of most jobs at a particular exertional level. *See, e.g.,* Ramirez, 225 F. App'x 331-32.

79. Here, the Court determined that Ortiz had nonexertional impairments in the form of neck pain, occasional episodes of vertigo, deafness in the right ear, a finger impairment, depression, and anxiety. However, the Court determines that substantial evidence supports the ALJ's findings, under the circumstances of this case, that the nonexertional limitations would have a negligible

effect on the availability of work at the light exertional level.  For example, the ALJ noted that while Ortiz had significant hearing loss in her right ear, she was told her hearing would be improved through the use of a hearing aid.  Ortiz did not obtain a hearing aid and testified she had no problems hearing normal conversation. [AR 42.] In addition, the ALJ addressed Ortiz's complaints of vertigo, noting that she drove a motor vehicle regularly.  Moreover, Ortiz testified at the ALJ hearing that the vertigo was periodic and might not last long. [AR 506.]

80.     The ALJ also addressed Ortiz's allegations of intermittent situational depression and anxiety, stating that she discussed these impairments at length at step two.  She concluded that they did not significantly erode Ortiz's occupational base. [AR 36, 42.] For example, when Ortiz's physician recommended a counselor to Ortiz, she stated she did not want to use a therapist. [AR 36.] In addition, while the ALJ did not expressly refer to the medical records as indicating fewer and fewer allegations of pain after the April 2004 back surgery, the ALJ's lengthy and longitudinal discussion of many of the medical records and Ortiz's daily activities demonstrates few complaints of pain after Ortiz's "successful" back surgery. [AR 40-41; *see also,* AR 241, 300] (arm pain is gone; returning to previous activities; surgery successful).

81.     The Court concludes that the ALJ did not commit error by not consulting a vocational expert for the step five findings and that substantial evidence supports her findings.

D.      Credibility Determination

82.     It is well established that "[c]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). "However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  Id. (quotation and alteration omitted).

23

83.     The ALJ set forth the factors from S.S.R. 96-7p and then spent the three and one-half pages identifying evidence from the record that related to the factors and supported her credibility determination.  For example, the ALJ carefully discussed the medical records that documented Ortiz's injury, symptoms and surgery.  Then, the ALJ also noted many subsequent medical records and testing results documenting Ortiz's improvement, minimal need for pain medication, and her rather active life. [AR 38-42.]

84.     The Court concludes that the ALJ properly considered the relevant factors and the evidence in the record in making her credibility determination, that the determination was supported by substantial evidence, and that she committed no error.

## III.   **RECOMMENDATION**:

The Court recommends that Ortiz's motion for reversal or remand be DENIED and that this matter, in its entirety, BE DISMISSED, WITH PREJUDICE.

Robert Hayes Scott
ROBERT H. SCOTT
UNITED STATES MAGISTRATE JUDGE